IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 3:14-cr-05047-MDH-1 |
| LOUIS ANTHONY HARDISON, | ) ) ) |
| Defendants. | ) ) ) |

## ORDER

Before the Court is Defendant's Motion to Suppress (Doc. 47). The Indictment charges Defendant, a convicted felon, with knowing possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant moves to suppress all evidence obtained by law enforcement officers as a result of his detention, seizure, and arrest at his home on November 27, 2013. Defendant argues the evidence should be suppressed because the officers unlawfully entered his home in violation of the Fourth Amendment. The Court has carefully reviewed the cases and suggestions submitted by the parties, including those submitted by Defendant in his pro se filings. Upon consideration, the Court hereby **DENIES** Defendant's motion.

## FACTUAL FINDINGS

On November 27, 2013, a Newton County Dispatcher received a frantic 911 call from a woman requesting assistance at 200 Hillcrest Drive in Neosho, Missouri. The caller identified herself as Dushawnne Hoyt and reported a domestic dispute involving her boyfriend. She exclaimed during that call that "I will be . . . dead before you get all this information . . . he got a butcher knife to my . . . neck and he got a gun." The dispatcher relayed the information

regarding an armed domestic disturbance at 200 Hillcrest Drive to the Neosho Police Department. Officer Gold arrived on the scene shortly thereafter.

According to Officer Gold, when he arrived at the residence, Ms. Hoyt was standing near the roadside next to her car. After he spoke with Ms. Hoyt for approximately thirty seconds he went to speak to Defendant, who was standing near the front door to his residence.[1] Officer Fohey, who had arrived on the scene moments after Officer Gold, remained with Ms. Hoyt. Officer Gold saw no firearms or weapons in Defendant's hands and approached Defendant in a normal manner. The officer testified that he asked Defendant what was going on and why he was called out to the residence. Officer Gold testified that when he was roughly five feet away from Defendant, who was standing just inside the doorway to the residence, he asked if they could speak inside the residence and Defendant responded "sure" and allowed Officer Gold into the residence.[2] Once inside, Defendant explained that he and Ms. Hoyt were in an ongoing civil dispute and that Ms. Hoyt grabbed a knife so he was forced to defend himself. Defendant and Officer Gold conversed for approximately two minutes before Officer Fienan entered the residence.

Officer Fienan entered the residence after he spoke briefly with Ms. Hoyt, learned from Officer Fohey that Defendant was inside the residence with Officer Gold, and observed Defendant and Officer Gold through the screen door.[3] Upon entering, Officer Fienan joined Defendant and Officer Gold in the kitchen. At some point during the ensuing conversation,

---

[1] Although Defendant and Ms. Hoyt were in a relationship at that time, Defendant was the sole owner and resident of the home.

[2] Officer Gold testified that he asked to speak inside the residence "[t]o keep them further separated so I could get his side of the story without having arguments entailed while I was speaking with the party." Tr. 54.

[3] Defendant claims the officers' testimonies were inconsistent as to the purported timeline. The Court finds the officers' timelines were not inconsistent. Officer Gold testified that he arrived at the residence first, spoke to Ms. Hoyt for approximately thirty seconds, approached Defendant and asked if they could speak inside, and spoke to Defendant inside for approximately two minutes before Officer Fienan entered the residence. Officer Fienan testified that he arrived probably one or two minutes after Officers Gold and Fohey, that at that time Defendant and Officer Gold were already inside, and that he entered the house after briefly speaking with Ms. Hoyt.

Officer Fienen asked Defendant whether there was a gun in the residence as Ms. Hoyt reported. Defendant pointed to a green duffle bag on the ground and stated the only gun he had was "in there." Officer Fienen opened the duffle bag and secured the gun. He then asked Defendant whether there were any other guns in the residence because this gun did not match the one described by Ms. Hoyt. Defendant admitted there was another gun in his bedroom. Defendant showed the officers the location of the second gun and the officers secured that gun. Officer Fienen explained to Defendant that he is a felon and should not be in possession of a firearm. Defendant indicated he understood and realized he should not be in possession of the firearms.

## ANALYSIS

Defendant moves to suppress all evidence including statements and physical evidence obtained by the officers after they entered Defendant's home. Defendant argues the officers' entry into his residence violated the Fourth Amendment because the officers lacked a warrant, consent, or exigent circumstances. He argues the evidence acquired after the allegedly illegal entry constitutes "fruit of the poisonous tree." The Government counters that the officers lawfully entered Defendant's home based on consent and/or exigent circumstances. The Court agrees with the Government that Defendant voluntarily consented to the officers' entry; therefore, suppression is inappropriate.

"Generally, to search a private place, person, or effect, law enforcement must obtain from a judicial officer a search warrant supported by probable cause." *United States v. Williams*, 346 F.3d 796, 798 (8th Cir. 2003) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). "Where a person having authority over the premises voluntarily consents to a search, however, law enforcement may conduct a warrantless search without running afoul of the Fourth Amendment." *Id.* Consent may be reasonably implied from behavior. *Id.* at 799. "The precise question is not whether [the defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented." *United States v. Williams*, 521

3

F.3d 902, 906-07 (8th Cir. 2008). In addition to showing actual or implied consent, the government must also prove by a preponderance of the evidence that the defendant's consent was voluntary based on the totality of the circumstances. *Williams*, 346 F.3d at 799; *see generally United States v. Esquivias*, 416 F.3d 696, 700 (8th Cir. 2005) (discussing factors to consider in assessing voluntary consent).

Here, the evidence shows Defendant expressly or impliedly manifested consent for the officers to enter his residence. When Officer Gold asked Defendant if they could go inside to talk about the events that had transpired, Defendant replied "sure" and allowed Officer Gold to enter the residence.[4] Defendant never asked the officers to leave or exhibited behavior limiting or withdrawing his initial consent.[5] In fact, the record shows Defendant ushered the officers around his house to show where the events in question took place and where his guns were located. Under the circumstances presented here, Defendant's words and actions manifested consent for the officers enter his home. *See United States v. Williams*, 346 F.3d 796 (8th Cir. 2003) (consent where officers asked to enter and wife opened door further, stepped back, and uttered "okay"); *Rollen v. City of Bowling Green*, No. 2:08CV34 JCH, 2009 WL 5030779, at *4 (E.D. Mo. Dec. 15, 2009) (consent where officers asked mother whether defendant was present and she opened door to the residence and stepped back out of the way); *see also United States v. Castellanos*, 518 F.3d 965, 970 (8th Cir. 2008) (reasonable belief that defendant consented to entry where defendant allowed officers to follow him into residence with no objection).

---

[4] Defendant argues Officer Gold's testimony is not credible because he did not include information about consent to enter in his report. While the Court has considered this factor in assessing credibility, the Court finds Officer Gold's testimony credible based on the totality of the circumstances. The fact that he omitted to put information regarding consent to enter, which the Court notes is different than consent to search, in his report is not dispositive.

[5] Officer Fienan's entry into the residence was reasonably within the scope of Defendant's consent for Officer Gold to enter the residence. He entered only a few minutes after Officer Gold and did so to complete the same task. He saw the two conversing through the screen door and went directly to where they were. Defendant did not object or limit/withdraw consent when Officer Fienan entered. *United States v. McMullin*, 576 F.3d 810, 815 (8th Cir. 2009) ("when an occupant of the house gives consent for entry, he must make an unequivocal act or statement to indicate the withdrawal of the consent. . . . In assessing the scope of a person's consent, we must examine the totality of the circumstances, which includes the language of a person's consent and his actions during the officers' search.").

Although Defendant testified that the officers never asked for consent and he never provided consent, the Court finds Defendant's testimony not credible.[6]

Moreover, the totality of the circumstances show Defendant's consent was voluntarily given. Officer Gold approached Defendant in a relaxed manner with no guns or weapons drawn, in his normal uniform, and he never raised his voice towards Defendant. Officer Gold was roughly five feet away from Defendant when he asked for consent to enter. Both officers testified that Defendant appeared coherent at the time of the encounter and answered questions appropriately and respectfully.[7] Defendant was not under arrest or in custody at the time of consent, nor was he placed in handcuffs or restraints before or after entry into the home; rather, the officers were investigating the alleged armed domestic dispute. The evidence further shows Defendant is a 55-year-old man with at least average intelligence[8] and a criminal history, suggesting Defendant is aware of the rights afforded to criminal suspects, including the right to remain silent and the right to refuse consent. The evidence shows Defendant had previous contact with Officer Gold and complained to the Neosho police chief on multiple occasions

---

[6] When asked what happened when the police officer arrived, Defendant stated: "I can't remember exactly how -- what had transpired, but when they pulled up I went in the house and moments later again I believe it was Sergeant Fienan that first came to the house and before I knew anything he was entering the home." Tr. 83. When asked whether he attempted to throw the officers out of his house, he testified: "I questioned them as far as them coming in and the -- Sergeant Fienen was somewhat -- the proper wording would probably be that -- a little bold. Since I have numerous disabilities, when they came in, I can't remember what he said verbatim so I just backed up and they were in the house." Tr. 84. This testimony by Defendant does not necessarily establish that the officer did not request consent to enter or that Defendant did not manifest consent to enter. Moreover, Defendant's testimony that he "felt" the officers should not be in his residence is irrelevant. *See United States v. Williams*, 521 F.3d 902, 906-07 (8th Cir. 2008) ("The precise question is not whether [the defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented."). The Court finds Defendant's testimony not credible because it is vague, inconsistent with both officers' testimonies, somewhat inconsistent with Defendant's other actions that day showing he voluntarily spoke to officers and divulged the location of his guns, and because Defendant was previously convicted for a crime involving dishonesty.

[7] Defendant argues the officers' testimonies are inconsistent with Officer Gold's report, which states he could smell intoxicants on Defendant's breath, his speech was slurred, and he stumbled when he walked. However, there is no evidence to indicate Defendant, although potentially intoxicated, could not understand the situation or respond politely and appropriately. Defendant does not argue he was intoxicated or could not understand the situation. Thus, while intoxication is a factor to consider in assessing voluntariness, the Court finds Defendant's potential intoxication here does not render Defendant's consent involuntary.

[8] Defendant's pro se filings demonstrate Defendant can write clearly, conduct research, and pay attention to detail.

regarding conduct of the Neosho police officers, suggesting Defendant is not intimidated by or around law enforcement personnel. The only evidence that may question the voluntariness of Defendant's consent is Defendant's own testimony, which the Court finds vague, equivocal, not credible, and not persuasive.[9] Based on the totality of the circumstances, the Court finds Defendant's consent was voluntary.[10]

Because the Court finds the officers lawfully entered Defendant's home based on the consent exception to the warrant requirement, it is unnecessary to address the issue of exigency.

## DECISION

Based on the foregoing discussion, the Court hereby **DENIES** Defendant's motion to suppress (Doc. 47). The Court also denies Defendant's various pro se motions as they have been previously addressed by the Court (Doc. 21) or constitute pro se motions filed by a party represented by counsel (Docs. 24, 25).

**IT IS SO ORDERED:**

Date: June 30, 2015

                                           */s/ Douglas Harpool*
                                           **DOUGLAS HARPOOL**
                                           **UNITED STATES DISTRICT JUDGE**

---

[9] Defendant's testimony suggests Defendant allowed the officer to enter his home because the officer was "a little bold" and because Defendant had a disability and did not want to get into an altercation with the officer. Tr. 84. The Court finds this testimony non-credible based on the contrary credible testimony of Officer Gold (indicating Officer Gold rather than Officer Fienan obtained initial consent and did so after casually asking to speak inside from five feet away), Defendant's criminal history and knowledge of criminal suspects' rights, Defendant's experience with complaints and exposure to police officers and his failure to file a complaint in this instance, and his prior crime involving dishonesty. Even assuming Defendant's statements are accurate, they are not specific enough to rebut the Government's evidence of voluntariness (i.e. how was officer threatening and "a little bold"?).

[10] Defendant cites to *United States v. Serabia-Ferrel*, No. CRIM. 11-174 DSD/FLN, 2011 WL 3625140, at *2 (D. Minn. Aug. 17, 2011), to support his position that his consent was not a product of free will. In *Serabia-Ferrel*, seven federal agents armed with weapons and bullet proof vests knocked on defendant's door in the middle of the night and stated they wanted to come in to speak with the defendant. The court found the subsequent consent to enter and search was the result of submission to authority rather than voluntary choice. Here, by contrast, there was one officer who approached Defendant with no weapons drawn and donning normal attire, the Defendant knew the officers were there to respond to the 911 call made by his girlfriend moments before, and Defendant was awake and watching the scene through his front door. Although this case is similar to *Serabia-Ferrel* because Officer Gold did not advise Defendant he could refuse consent, the case is distinguishable because the "implied threat or covert force" of seven armed officers that was present in *Serabia-Ferrel* was not present in this case.

6